**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**REBECCA BUTLER,**
**Plaintiff,**

**-vs-** **Case No. 6:11-cv-1958-Orl-28GJK**

**ADVANCE/NEWHOUSE PARTNERSHIP,**
**Defendant.**

---

# ORDER

Rebecca Butler brings this action against her former employer, Advance/Newhouse Partnership ("Advance"), alleging interference with leave under the Family and Medical Leave Act ("FMLA"),[1] retaliation under the FMLA, and disability discrimination in violation of the Florida Civil Rights Act of 1992 ("FCRA").[2] Advance has moved for summary judgment on all claims, and as set forth below that motion must be granted.[3]

## I. Background

Advance manages Bright House Networks, LLC, which provides cable television, internet, and telephone service to customers in central Florida. Advance operates customer service call centers staffed by Customer Service Professionals ("CSPs"), Lead CSPs ("Leads"), Supervisors of Customer Care, Managers of Customer Care, and a Director of

---

[1]29 U.S.C. § 2601 et seq.

[2]§§ 509.092, 760.01-760.11, Fla. Stat.

[3]The pertinent filings are: Defendant Advance/Newhouse Partnership's Motion for Summary Judgment (Doc. 27); Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 29); and Defendant Advance/Newhouse Partnership's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 30).

Customer Care. CSPs work in teams of fifteen to twenty, and each team is assigned a Lead, who in turn works under the direction of a Supervisor. The Supervisors report to a Manager, and the Managers report to the Director.

Butler began her employment with Advance in April 2004 as a CSP at Advance's call center in DeLand, Florida. In May 2005, Advance promoted Butler to the position of Lead. Leads did not have responsibility for annual reviews or discipline of CSPs, but they did coach CSPs about how to handle calls and give CSPs feedback about their performance. (Butler Dep. at 81-82, 85; Valerie Gabaree Aff. ¶ 6). All calls of CSPs were recorded and stored, and a password was needed to get into the recorded call system. (Butler Dep. at 101-02). Leads typically coached CSPs by reviewing with the CSPs recordings of those CSPs' own calls. (Id. at 82-84). Leads could access the recorded calls of all CSPs—even those on other teams—but CSPs could only access recordings of their own phone calls. (Id. at 101-02).

On Monday, July 20, 2009, Lisa Stinson, a CSP at the DeLand call center who was not on Butler's team, took a call from a customer that devolved into what all agree was "a highly inappropriate sexual conversation." (Gabaree Aff. ¶ 11; accord Butler Dep. at 194). Stinson was terminated because of the call. (See, e.g., Gabaree Dep. at 34). When Butler arrived at work on Wednesday, July 22—after having Tuesday off—everyone was talking about the phone call. (Butler Dep. at 186, 202). Stinson's Lead, Miranda Tyler, had sent an email to Supervisors and other Leads—including Butler—with an attachment of a ".wav file" of the recorded Stinson phone call. (Kimberly Struhs Dep. at 8; Butler Decl. ¶ 4; Butler Dep. at 186-87). Upon receiving the email that morning, Butler listened to the phone call at her

desk, using a headset. (Butler Dep. at 188).

Later that day, another CSP, Mary Economou,[4] asked Butler if she had listened to the call. When Butler responded that she had, Economou asked to listen to it. (Id. at 189). Butler and Economou—both wearing headsets—then listened to part of the call at Butler's desk; the call was lengthy,[5] and Butler fast-forwarded to the end of it—the most sexually explicit portion—and they listened only to that portion. (Id. at 188-95).

Five days later, on Monday, July 27, 2009, call center Manager of Customer Care Ryan Marks called Butler into her office, and the Supervisor of Butler's team, Ruth Infante, was also present. (Id. at 204). Marks had been told by another CSP that Butler had played the call for Economou, and she asked Butler if she had indeed done so. (Id. at 204; Marks Aff. ¶¶ 6 & 8). Butler acknowledged that she had, and Marks told her that Marks would have to discuss the matter with the Director, Valerie Gabaree. (Butler Dep. at 205; Marks Aff. ¶ 8). Marks also interviewed Economou, who confirmed that she and Butler had listened to the call. (Marks Aff. ¶ 8).

After learning from Marks of Butler's actions, Gabaree sent an email to the Human Resources Director, Kris Buse, and Gabaree's boss, Senior Director of Operations Joe Cordaro, recommending Butler's termination. (Gabaree Dep. at 42; Ex. 6 to Gabaree Dep.). Cordaro and the Senior Director of Human Resources, Linda Tharpe, approved the

---

[4]Although Economou was employed at the call center as a CSP, she was not working on the day at issue; instead, she was at the center to visit her mother, who also worked there. (Butler Dep. at 188-89). Economou had formerly worked on Butler's team but was on a different team at the time of the events involved here. (Id. at 182-83, 193).

[5]The call lasted between twenty and thirty minutes.

termination, (Ex. 6 to Gabaree Dep.; Buse Dep. at 44; Tharpe Aff. ¶ 11), and on July 29, 2009, Marks and Gabaree informed Butler that she was terminated. (Marks Aff. ¶ 10).

Meanwhile, on July 23, 2009, Butler had submitted a request for leave under the FMLA based on back surgery scheduled for July 30, 2009. (Tharpe Aff. ¶ 8). That leave request was approved in a notice dated July 29, 2009; when Plaintiff arrived home after being terminated that day, the notice of approval was waiting for her in the mail. (Butler Dep. at 155-56; Notice, Ex. 18 to Butler Dep.).

Butler filed this lawsuit in state court in July 2011, (Doc. 2), and it was removed to this Court in December 2011, (Doc. 1). Butler contends that Advance interfered with her right to take FMLA leave and terminated her in retaliation for requesting such leave. Additionally, Butler alleges that in terminating her, Advance discriminated against her based on a perceived disability in violation of the FCRA.

## II. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer, 243 F. Supp. 2d at 1262 (quoting Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). "[T]he summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000)

## III. Discussion

### A. FMLA Claims

"The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1-year period following certain events," Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002), including "a serious health condition that makes the employee unable to

perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D). "Leave must be granted, when 'medically necessary,' on an intermittent or part-time basis," and "[u]pon the employee's timely return, the employer must reinstate the employee to his or her former position or an equivalent." Ragsdale, 535 U.S. at 86 (citing 29 U.S.C. §§ 2612(b)(1) & 2614(a)(1)). "The Act creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006).

The Eleventh Circuit has "recognized that [the FMLA] creates two types of claims: 'interference claims, in which an employee asserts that h[er] employer denied or otherwise interfered with h[er] substantive rights under the Act, and retaliation claims, in which an employee asserts that h[er] employer discriminated against h[er] because [s]he engaged in activity protected by the Act.'" Id. (citing 29 U.S.C. § 2615(a) and quoting Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001)). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied." Strickland, 239 F.3d at 1206-07. "In contrast, to succeed on a retaliation claim, an employee must demonstrate that h[er] employer intentionally discriminated against h[er] in the form of an adverse employment action for having exercised an FMLA right." Id. at 1207. "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that h[er] employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" Id. (quoting King v. Preferred Technical Grp., 166 F.3d 887, 891 (7th Cir. 1999)).

Butler brings both types of FMLA claims in this case.

1. Retaliation

Butler contends that Advance terminated her in retaliation for seeking medical leave covered by the FMLA. "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, [courts] apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for evaluating Title VII discrimination claims." Strickland, 239 F.3d at 1207. Butler has not presented any direct evidence of retaliatory intent, and thus the Court evaluates her FMLA retaliation claim under the McDonnell Douglas scheme.

Under this framework, Plaintiff has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. See, e.g., Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). Once the plaintiff has presented a prima facie case and its attendant presumption, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas, 411 U.S. at 802. "If the [employer] does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Hurlbert, 439 F.3d at 1297.

To make a prima facie showing of retaliation, a plaintiff must establish: (1) that she engaged in activity protected by the FMLA; (2) that she was subjected to a materially

adverse action by her employer; and (3) a causal connection between the activity and the adverse action. See Strickland, 239 F.3d at 1207; see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006) (refining retaliation standard to include "materially adverse actions" and not only "adverse employment actions"). It is undisputed that Butler satisfies the first two elements; she applied for FMLA leave and she was terminated. However, Advance challenges whether Butler has established the "causal connection" component of the prima facie case.

To establish a causal connection, Butler must show "that the protected activity and the adverse action were not wholly unrelated." Simmons v. Camden Cnty. Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985). Generally, close temporal proximity is enough to satisfy a causal connection. Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000). In this case, the temporal proximity was extremely close—a matter of days. However, intervening events can negate the inference of causation that may arise from temporal proximity. See Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520 (11th Cir. 2007) (noting, in discussing prima facie case, that "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity"); accord DeLeon v. ST Mobile Aerospace Eng'g, Inc., 684 F. Supp. 2d 1301, 1325 (S.D. Ala. Feb. 9, 2010) ("The Eleventh Circuit has made clear that even if a plaintiff is terminated in close temporal proximity to [protected activity], a plaintiff's intervening act of misconduct severs the causal connection between the [protected activity] and the decision to terminate her employment." (citing Hankins)).

Here, Butler requested and was granted FMLA leave at around the same time she engaged in misconduct—just before she was terminated. Her act of misconduct severed the inference of causation that might otherwise arise from the close temporal proximity. Moreover, even if the Court assumed that the inference was not severed and that Butler had established a prima facie case, Butler's case would fail at the pretext stage of the analysis. In other words, if Butler's act of misconduct is not viewed as cutting off the causation prong of the prima facie case, it certainly satisfies Advance's burden of articulating a legitimate, nondiscriminatory reason for the termination, and Butler has failed to present evidence sufficient to survive summary judgment regarding whether Advance's reason is merely a pretext for FMLA retaliation. See, e.g., Chapman, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.").

Butler admitted in her deposition that there was no legitimate business purpose in sharing the phone call with Economou or listening to the sexually explicit portion of the call. (Butler Dep. at 195). Butler also agreed that as a Lead with access to that phone call, it was "highly inappropriate" for her to have allowed Economou to listen to it with her and that she should not have let Economou listen to the call. (Id. at 196-97, 205-06). Butler testified that CSPs "are not supposed to have access to each other's phone calls"; that there is no legitimate business reason for CSPs to have access to other CSPs' phone calls; and that as a CSP, Economou could only listen to the call if a Lead or Supervisor accessed it for her. (Id. at 103, 192). When asked why she allowed Economou to hear the call, Butler stated,

"It was something stupid that I did. I was not thinking and kind of got all caught up in all of the office talk and gossip and everybody talking about it." (Id. at 197).

Despite acknowledging the impropriety of her actions, Butler argues that the asserted reason for her termination is merely a pretext for FMLA retaliation. "To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Hurlbert, 439 F.3d at 1298 (internal quotations and citations omitted). In determining whether an issue has been raised as to pretext, this Court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and internal quotation omitted). This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)).

Applying these standards, Butler has not presented evidence sufficient to create a genuine issue of material fact regarding whether Advance's reason for terminating her was merely a pretext for unlawful retaliation. Butler attempts to raise an issue as to pretext by adducing "comparator evidence showing that her co-workers, who were not in her protected

categories, were treated more favorably." (Doc. 29 at 17). In this regard, Butler asserts that Economou also engaged in misconduct by asking to listen, and listening to, the phone call, and that Tyler acted inappropriately by sending an email with the phone call as an attachment.

However, neither of these employees is a proper comparator, and Butler has not identified any similarly-situated employee who engaged in the same misconduct. Economou was a CSP, not a Lead, and Tyler, though a Lead, did not play the call for a CSP who would not otherwise have had access to it but instead only attached the call to an email that she sent to Supervisors and other Leads—employees who already could access the call from Advance's recording system anyway. Butler has identified other employees who listened to the call, but all of those employees were Leads or Supervisors. (Butler Dep. at 198-99, 201-02). Butler does not know of any Lead who accessed the call in order to allow a CSP to listen to it, and she does not know of any CSP other than Economou who listened to the call. (Id. at 203). The Court thus rejects Butler's attempt to cast Advance's employment decision as "selective enforcement."[6]

---

[6]Butler also attempts to make an issue of the fact that Marks, Gabaree, and Buse did not know about Tyler's email attaching the call but instead thought that Butler had accessed the call from the recording system and played it for Economou from there—rather than playing the .wav file attached to the email. (See Marks Dep. at 20; Gabaree Dep. at 33; Buse Dep. at 23). However, this is a distinction without a difference. Butler acted inappropriately in sharing the call with a CSP regardless of how she accessed it for the purpose of playing it for the CSP.

Relatedly, Butler argues that Tyler acted inappropriately in sending the email and that Infante, who testified that she did know about the email, (Infante Dep. at 24), should have investigated the email or reported it so it could be investigated. The email has not been presented as evidence in this case; Butler states in a footnote to her summary judgment response that Advance informed her that the email had been purged from its system and

Butler additionally argues that her actions did not constitute a "breach of confidentiality" as asserted by Advance. Butler was aware that Advance had a confidentiality policy, but she believed that the policy referred to sharing information with persons outside the company—not to those within the company. Furthermore, Butler asserts that Advance's printed "Electronic Information Protection Policy" (Ex. 6 to Butler Dep.) does not prohibit the conduct at issue, and she notes that Gabaree testified in her deposition that she did not rely on any written policy in determining that Butler committed a breach of confidentiality, (Gabaree Dep. at 41-42), while Gabaree's affidavit does refer to the written Electronic Information Protection Policy, (Gabaree Aff. ¶ 8).

None of these assertions casts doubt on Advance's explanation for Butler's termination. The termination documents refer to Butler's actions as "poor judgment" and "breach of confidentiality." Butler has readily and repeatedly acknowledged that it was "highly inappropriate" for her to play the call for Economou, that such action lacked a legitimate business purpose, and that CSPs were not supposed to have access to other CSPs' phone calls. Thus, she has admitted violating rules even aside from any specific

---

could not be produced. (Doc. 29 at 5 n.5). In another footnote, Butler refers to the email as "key evidence" and suggests that Advance's summary judgment motion should be denied as a sanction for its destruction of this evidence. (Id. at 17 n.16). However, none of the deponents or affiants have been able to testify as to the content of the email at issue; Butler testified in her deposition that she does not "even know [whether] the email actually said anything" and may have just consisted of the attached .wav file without an accompanying message. (Butler Dep. at 186-87). Absent some evidence of the content of the email, the Court can conclude only that Tyler sent an email with an attachment of a recorded call that the email recipients could have accessed through other means anyway, and such conduct does not support Butler's "selective enforcement" argument. The Court also rejects Butler's footnoted, eleventh-hour suggestion of misconduct by Advance in connection with its inability to produce the email.

printed policy. Furthermore, Advance's Electronic Information Protection Policy states that Advance's electronic information resources, including its email and communications facilities and access mechanisms for those services, were "the property of the Company and [were] to be used only for the purpose of conducting its business or other Company-approved uses." (Ex. 6 to Butler Dep. at 2). The policy additionally states that "e-mail . . . and other electronic information resources are not to be used in a way disruptive or offensive to others, or otherwise harmful to the working environment." (Id.). Butler's conduct in replaying the sexually explicit phone call for a CSP who could not otherwise have accessed it, for no legitimate business purpose and in the midst of a swarm of gossip at the call center, certainly can be fairly characterized as falling within the prohibitions of this policy. Hence, the Policy supports Advance's position as well, even if Gabaree did not rely on it at the time she made the termination recommendation but instead listed it as additional support in her affidavit.[7] In sum, regardless of whether Butler's conduct is characterized as "breach of confidentiality," "poor judgment," or some other form of misconduct, it was, by Butler's own admission, "highly inappropriate" and in violation of Advance's rules, whether written or unwritten.

Butler also attempts to cast doubt on Advance's explanation by pointing to what she characterizes as "the consistent practice of subjecting Butler to adverse actions when she requested leave." (Doc. 29 at 19). However, the record does not support this assertion. Butler relies on performance notices that were issued to her in February and April 2008

[7](See Gabaree Aff. ¶ 8 ("Access to . . . service-call recordings is severely restricted . . . . Furthermore, [Advance's] Electronic Information Protection Policy provides that the Company's electronic information may be used only for business-related purposes . . . .")).

based on absenteeism and tardiness. (Exs. 14 & 15 to Butler Dep). Some of the absences were due to Butler suffering from strep throat and sinusitis, and Butler explained in her deposition that after Advance issued these notices to her, she applied to have her sickness-related absences approved retroactively as intermittent FMLA leave.[8] Advance approved that application, and the disciplinary notices were then rescinded and she suffered no adverse consequences as a result of them. (See Butler Dep. at 127-42). Contrary to Butler's assertion of a "consistent practice of adverse actions," the record instead reflects that Butler had requested and been granted FMLA leave several times in prior years, and she has not identified any adverse action she suffered in connection with any of those leave periods.

Finally, Butler challenges the investigation conducted by HR Director Buse, faulting him for not interviewing her and for speeding up his investigation so the matter could be resolved before her FMLA period commenced. Buse's investigatory practices do not, however, cast doubt on Advance's proffered reason. There was little investigation to conduct; Butler and Economou both admitted to Marks that they had listened to the phone call together, and Butler admits that she acted inappropriately and without a business purpose. The fact that Advance acted quickly to arrive at a decision regarding whether and how to discipline Butler before her leave commenced also does not call into question Advance's termination decision.

The Eleventh Circuit has emphasized that "[f]ederal courts 'do not sit as a super-

---

[8]Butler had not applied for FMLA leave prior to being written up for absenteeism. (Butler Dep. at 133, 135).

personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere. Rather, [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)). Butler's claim does not survive the pretext analysis. "[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." Combs, 106 F.3d at 1543.

Even if Butler is given the benefit of the doubt on the causal connection element of her prima facie case of FMLA retaliation, her claim fails at the pretext stage of the McDonnell Douglas analysis. Advance's motion for summary judgment shall be granted on Butler's FMLA retaliation claim.

2. Interference

In her FMLA interference claim, Butler asserts that "[a]fter acknowledging her eligibility [for FMLA leave] by approving Butler's leave request, [Advance] immediately terminated Butler's employment" and "thereby interfered with Butler's exercise of rights under the FMLA." (Am. Compl. ¶¶ 30-31). As discussed in connection with the retaliation claim, Butler was terminated for misconduct before her approved leave period commenced, and she has not presented evidence casting doubt on Advance's reason for terminating her. The FMLA interference claim therefore fails.

B. FCRA Claim

The FCRA prohibits employment discrimination on the basis of "handicap," and FCRA claims "are analyzed in the same manner as claims under the Americans with Disabilities Act." Ross v. Jim Adams Ford, Inc., 871 So. 2d 312, 314 (Fla. 2d DCA 2004). The Americans with Disabilities Act ("ADA") defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (b) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).[9] Butler does not contend that she had a disability or a record of a disability; she alleges only that Advance discriminated against her on the basis of a perceived disability as set forth in the third definition—that is, that Advance "perceived that Butler's medical condition rendered her disabled and unable to work." (Am. Compl. ¶ 21).

Advance argues that Butler has not presented evidence that Advance regarded her as disabled, and the Court agrees. At most, there is evidence that Advance knew that Butler was experiencing some back pain, was about to have back surgery, and was about to take FMLA leave to recover for that surgery; this alone, however, is not evidence that Advance regarded her as disabled within the meaning of the ADA. The Court also rejects Butler's attempt to rely on her past bouts with sinusitis and strep throat as support for a perception of disability. (See Doc. 29 at 14-15).

[9]Following the ADA Amendments Act of 2008, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

Moreover, the ADA expressly provides that the "regarded as" definition of disability does "not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." Id. § 12102(3)(B). Whether an impairment is "'transitory and minor' is to be determined objectively" rather than subjectively. 29 C.F.R. § 1630.15(f). There is no evidence that anyone—Butler, her doctor, or Advance—expected the duration of any impairment to be more than six months, and thus there is no basis for an objective or even a subjective expectation of an impairment lasting more than six months.[10] Butler was able to work up until the day of her surgery despite experiencing some back pain, and she requested and was granted leave time to recover from that surgery. Butler herself alleges that Advance's "perception was and is incorrect, as [her] condition was of the type that would only require a temporary leave of absence." (Doc. 6 ¶ 21).[11] Furthermore, in the paperwork supporting Butler's application for FMLA leave, Butler's surgeon estimated that Butler would be incapacitated for twelve weeks after the back surgery. (See Ex. 17 to Pl. Dep.). Cf. White v. Interstate Distrib. Co., 438 F. App'x 415, 420 (6th Cir. 2011) ("There is no question that White's impairments are transitory, as his doctor

[10] The actual duration of Butler's impairment ended up being even less than anticipated. Butler testified in her deposition that the surgery was successful and she could have returned to work in thirty days. (See Butler Dep. at 154-55).

[11] Butler's own allegations highlight an important difference between the FMLA and the ADA. See generally Spangler v. Fed. Home Loan Bank of Des Moines, 278 F.3d 847, 851 (8th Cir. 2002) ("The rights Congress created under the FMLA are fundamentally different than those granted under the ADA. One of Congress's purposes in enacting the ADA involved eliminating the discrimination qualified individuals with disabilities face in their day to day lives. In contrast, the FMLA was created, in part, because of 'inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'" (internal citations omitted) (quoting 29 U.S.C. § 2601(a)(4))).

expected his restrictions to be in effect for only a month or two. White's 'regarded as disabled' argument fails as a matter of law."). As an objective or subjective matter, the evidence supports only one conclusion—that Butler's impairment was transitory and minor—and Advance is entitled to summary judgment on Butler's FCRA claim.[12]

IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant Advance/Newhouse Partnerships's Motion for Summary Judgment (Doc. 27) is **GRANTED** as to all three of Plaintiff's claims.

2. Any other pending motions are **DENIED as moot**.

3. The Clerk is directed to enter a judgment providing that Plaintiff takes nothing from Defendant on any of her claims. Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida this 26th day of March, 2013.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

---

[12]Even if Butler had been able to establish that she was regarded as disabled, her disability claim would fail in any event because, as discussed with regard to the FMLA claims, Advance has articulated a legitimate nondiscriminatory reason for terminating Butler, and Butler has not presented evidence creating a triable issue as to pretext.